IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 13-40944 |
| DOMISTYLE, INC., | § | |
| | § | (Chapter 11) |
| Debtor. | § | |

**EMERGENCY MOTION FOR INTERIM AND FINAL: (I) AUTHORITY TO OBTAIN SECURED POSTPETITION FINANCING; AND (II) USAGE OF CASH COLLATERAL**

TO THE HONORABLE BRENDA T. RHOADES, CHIEF U.S. BANKRUPTCY JUDGE:

COMES NOW Milo H. Segner, Jr. (the "Receiver"), the duly appointed receiver for Domistyle, Inc. (the "Debtor"), the debtor and debtor-in-possession in the above styled and numbered bankruptcy case (the "Bankruptcy Case"), and files this his *Emergency Motion for Interim and Final: (i) Authority to Obtain Secured Postpetition Financing; and (ii) Usage of Cash Collateral* (the "Motion"), respectfully stating as follows:

## I.    PROCEDURAL BACKGROUND

1. On or about April 4, 2013, the 134th District Court of Dallas County, Texas (the "State Court") ordered the appointment of the Receiver as a general receiver for the Debtor. The State Court specifically authorized the Receiver to commence a bankruptcy case for the Debtor and to act on behalf of the Debtor as a "debtor-in-possession."

2. On April 12, 2013 (the "Petition Date"), the Receiver caused the Debtor to file its voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), thereby commencing the Bankruptcy Case and creating the Debtor's bankruptcy estate (the "Estate").

3. This Court has jurisdiction over the Bankruptcy Case and the subject matter of this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of this Motion is a core proceeding under 28 U.S.C. § 157 (b)(2).

## II. FACTUAL BACKGROUND

A. **THE DEBTOR**

4. The Debtor is in the business of designing, manufacturing, and selling scented candles and related decor. Most of the Debtor's customers include large national and international retailers. Towards this end, the Debtor owns and maintains a factory and warehouse in Laredo, Texas, and the Debtor maintains corporate offices in North Texas. The Debtor's principal secured lender is Frost Bank ("Frost"), with debt of approximately $21 million. The Debtor has substantial other creditors, including trade creditors, landlords, lenders, equipment lessors, utilities, and taxing authorities. The Debtor's principal assets consist of real estate and improvements, accounts receivable, inventory, equipment, intellectual property, and general business intangibles. In March, 2013, the Debtor reached the limits of its funding from Frost and essentially ran out of funds to continue operations.

5. In April, 2013, Frost filed a petition with the State Court against the Debtor, among others, including an application for the appointment of a receiver for the Debtor. Among other things, it appears that some of the Debtor's books and records, and that some of its reporting to Frost, may have been inaccurate. For these and other reasons, the State Court ordered the appointment of the Receiver displacing, in the process, the Debtor's management.

6. The Receiver has commenced the process of reviewing the Debtor's business, books and records, receivables, inventory, and potential litigation claims. In order to obtain access to "Chapter 5" claims, to obtain the protection of the automatic stay, and to obtain the

potential of a section 363 sale under the Bankruptcy Code, the Receiver determined that it was in the best interests of the Estate and all of its creditors and parties-in-interest to commence the Bankruptcy Case. In that manner, the Receiver, and all interested parties, will have the time, the "breathing spell," and the funding to review their options for the future of the Debtor, while preserving any going concern value and while preserving all assets of the Estate.

B. PREPETITION LOAN(S) AND CASH COLLATERAL

7. On or about August 17, 2011, Frost, as lender, and the Debtor, as borrower, each executed and entered into that certain Loan Agreement (the "Loan Agreement") regarding a $14,000,000.00 revolving line of credit, a $1,000,000.00 real estate term credit facility, and a $500,000.00 equipment term credit facility to be issued by Frost in favor of the Debtor (the "Loan"). Frost and the Debtor subsequently amended the Loan Agreement and the Loan to increase the revolving credit facility to $19,800,000.00 for the period of December 13, 2012 to March 31, 2013, whereafter the maximum amount of the revolving credit facility would be $16,300,000.00.

8. In connection with and pursuant to the terms of the Loan Agreement, on or about August 17, 2011, the Debtor executed and delivered to Frost a Revolving Credit Note in the original amount of $14,000,000.00 (the "Revolving Credit Note"), a Real Estate Term Note in the original amount of $1,000,000.00 (the "Real Estate Note"), and a Machinery and Equipment Term Note in the original amount of $500,000.00 (the "M&E Note") (collectively, the "Notes") and a Security Agreement ("Security Agreement"), a Subordinate Deed of Trust, Security Agreement, Assignment of Leases, Assignment of Rents, and Financing Statement (the "Deed of Trust"), a Trademark Collateral Security Agreement, a Security Interest Assignment (Patents &

Trademarks, and a Security Interest Assignment (Copyrights) (collectively, the "Security Agreements") covering various assets of the Debtor (the "Prepetition Collateral").

9. Pursuant to the Security Agreements, the Debtor granted to Frost contractual security interests in and to, among other things, accounts receivable, inventory, machinery, equipment, and general intangibles. As evidenced by that certain *UCC Financing Statement*, filed with the Texas Secretary of State on August 12, 2001, as amended, Frost has a perfected security interest in and to all assets of the Debtor constituting the Prepetition Collateral.

10. Additionally, Frost holds a subordinate deed of trust lien against certain real property and improvements owned by the Debtor in Laredo, Texas (the "Real Property"). The holder of the first-priority deed of trust lien against the Real Property is Southwest Securities, FSB ("Southwest").

11. As of the Petition Date, the Debtor's books and records list millions of dollars in outstanding accounts receivables and inventory. It appears that the Debtor's books and records may be inaccurate, and the Receiver has commenced the process of reviewing the same, including by taking physical inventories. Although the Receiver does not at present know the potential value of the Prepetition Collateral, it reasonably appears that several million dollars in Prepetition Collateral exists, excluding the Real Property. With respect to the Real Property, it appears that there is sufficient value to pay Southwest in full and that value over and above the same exists.

12. As of the Petition Date, approximately $21,206,120.84 remained due and owing to Frost under the Loan Agreement, as amended. Additionally, shortly after his appointment as Receiver, Frost advanced up to an additional $100,000.00 to the Debtor under the Loan Agreement and the Security Agreements to cover immediate and emergency expenditures.

C. **DEBTOR'S NEED FOR FUNDING AND BUDGET**

13. As of the Petition Date, the Debtor had a few thousand dollars on hand. Almost all of the Debtor's employees walked off the job due to non-payment. Landlords and contract parties were threatening action, at least one taxing authority was about to obtain a tax warrant, and the Debtor had no money to monetize its inventory and work-in-process, and to collect its receivables. The Receiver lacked basic funds to even taken an accurate inventory of the Debtor's factory and to employ security to safeguard that facility. Notwithstanding these difficulties, the Receiver immediately began to take possession of the Debtor's property and to manage whatever business the Debtor had remaining.

14. In the course of this process and after his preliminary assessment of the situation, the Receiver came to the opinion that continuing to operate the Debtor as a going concern, even if on a limited and targeted basis, was in the best interests of all creditors. Among other things: (i) significant accounts receivable remain to be collected, which is best and most efficiently undertaken by employees of an operating company; (ii) the Debtor has finished inventory which it can readily monetize; (iii) the Debtor has significant raw goods and material which can be used to make product on a targeted and profitable basis; (iv) the Debtor has substantial "obsolete" inventory which can be monetized through various liquidations; (v) various customers continue to place purchase orders for product; (vi) a sale of the Debtor as a going concern may maximize value, which requires the Debtor's Laredo facility to be operating, even if on a limited basis; (vii) operating the Debtor ensures that the Debtor's property is secure and safeguarded, and that machinery and equipment is well maintained; (viii) the Receiver needs time to decide whether the Debtor can be operated profitably under his supervision; (ix) the market for the Debtor's product remains strong; and (x) if a going concern sale cannot be readily effectuated, an orderly

liquidation is far more in the interests of all creditors than the type of chaotic shutdown the Debtor was facing.

15. In addition, the Receiver's preliminary analysis suggests that the Debtor and the Estate may have substantial and valuable causes of action against one or more third-party competitors for breach of contract, conversion, tortious interference, and a host of business torts, all stemming from a failed attempt by the competitor to acquire the Debtor and the competitor's apparent diversion of the Debtor's business to itself and the taking of the Debtor's intellectual and proprietary property. The Receiver is also investigating the state of the Debtor's books and records, in light of potential errors and inaccuracies.

16. Thus, the Receiver approached Frost and requested financing, in the form of cash collateral usage and the extension of new credit, to afford the Receiver the opportunity to fully investigate the foregoing opportunities, issues, and potential suits—initially, to determine what the best course for the Debtor and its creditors may be and, if a successful plan can be created, to implement that plan or, if one cannot be created, to commence an orderly liquidation of the Debtor.

17. Subject to various protections as outlined below, in the proposed order to this Motion, and in the Postpetition Financing Documents (defined below), Frost has agreed to the use of its cash collateral and to extend additional funding for these purposes. Without access to this funding, the Receiver and the Debtor have no funds and the Receiver would be forced to immediately shut down the Debtor and engage in a straight liquidation. The Receiver believes that this would result in a loss of substantial value to the Estate and to all creditors.

18. Attached hereto as Exhibit "A" and incorporated herein is the Receiver's budget for the Interim Period (defined below) reflecting the Receiver's estimated usage of cash

collateral (the "Budget"). The Budget is discussed at greater length below. The Receiver is in the process of preparing a budget for the Final Period (defined below) and will file and serve the same once prepared and prior to any final hearing on this Motion.

19. All creditors are advised that the Receiver and Frost have not concluded their negotiations regarding the Budget. The Receiver attaches the Budget to this Motion to provide maximum notice to all creditors and parties-in-interest, but reserves his right to modify the Budget as appropriate prior to or at any hearing on this Motion.

D. **POSTPETITION FINANCING**

20. Subject to final documentation and the form of orders entered by the Court, Frost has agreed to extend $500,000.00 in new funding (the "Postpetition Financing") to the Debtor, up to $250,000.00 of which would be available during the Interim Period with the balance available if the Court grants this Motion on a final basis. The Postpetition Financing will be evidenced by the following (collectively, the "Postpetition Financing Documents"): (i) that certain *Security Agreement*, attached hereto as Exhibit "B"; (ii) that certain *Revolving Promissory Note*, attached hereto as Exhibit "C"; and (iii) that certain *Loan Agreement*, attached hereto as Exhibit "D".

21. Creditors and parties-in-interest are cautioned that the Receiver and Frost have not finalized the form of the Postpetition Financing Documents. They are attached to this Motion to provide notice to all creditors and parties-in-interest, but the Receiver reserves his right to modify the Postpetition Financing Documents as appropriate prior to or at any hearing on this Motion.

22. The Postpetition Financing would be secured by valid, binding, perfected, non-avoidable, first priority liens and security interests in all of the property of the Debtor and the

Estate, with the exception of the Real Property, where the same would continue to be secured by Frost's subordinate deed of trust, and also with the exception of any valid, first-priority *ad valorem* tax liens (collectively, the "Postpetition Collateral"). In other words, the liens granted to Frost to secure the Postpetition Financing would not prime the liens of Southwest against the Real Property, to the extent that those liens are otherwise valid, and they would not prime any first-priority *ad valorem* tax liens.

23. Otherwise, the liens and security interests to be granted to Frost under the Postpetition Financing Documents and pursuant to this Motion would: (i) prime Frost, to which Frost consents; and (ii) cover property that is not otherwise subject to perfected security interests, *e.g.* business torts.

### III.    RELIEF REQUESTED

24. By this Motion, the Receiver and the Debtor request that the Court: (i) authorize the usage of cash collateral (defined below) during the Interim Period (defined below); (ii) authorize the Debtor to obtain the Postpetition Financing during the Interim Period; (iii) schedule a final hearing on this Motion to consider the Debtor's usage of cash collateral and entry into the Postpetition Financing and Postpetition Financing Documents on a final basis; and (iv) provide adequate protection to Frost and any other applicable creditor as outlined in this Motion.

25. As required by the Court's Local Rules, attached to this Motion is a proposed order for the interim use of cash collateral and Postpetition Financing. However, the Receiver cautions all parties that he and Frost have not agreed to the final form and substance thereof. The Receiver attaches the same to this Motion to provide maximum notice to all creditors and parties-in-interest, but reserves his right to modify the same as appropriate prior to or at any hearing on this Motion.

## IV.    ARGUMENTS AND AUTHORITIES

### A.    CASH COLLATERAL

26.    "Cash Collateral," as defined by the Bankruptcy Code, includes "the proceeds . . . of property" in which the estate "and an entity other than the estate have an interest." 11 U.S.C. § 363(a).  Here, Frost has an interest in, among other things, the Debtor's accounts receivables, inventory, and raw materials from which new inventory and receivables may be generated.  The Receiver and his agents have reviewed the Loan Agreement, Security Agreements, and UCC and other security instruments filed and recorded by Frost.  The Receiver is not aware of any basis on which to argue that Frost does not have perfected security interests pursuant to the same.  The Receiver is not aware of any claim or cause of action that the Estate may have against Frost, including any avoidance or subordination action.

27.    Pursuant to the Bankruptcy Code, the Debtor may not use Cash Collateral unless "each entity that has an interest in such cash collateral consents," or unless "the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2)(A)-(B) (2011).  Here, Frost has consented to the use of Cash Collateral upon the protections outlined in this Motion and to be proposed in any agreed order submitted to the Court on this Motion.

### B.    POSTPETITION FINANCING

28.    Section 364 of the Bankruptcy Code governs postpetition financing.  That section permits the Debtor to obtain secured financing if the Debtor is unable to obtain unsecured financing and if the collateral is property of the Estate that is not otherwise subject to a lien. *See* 11 U.S.C. § 364(c)(2).  If the Debtor proposes to grant a priming or co-equal lien against property of the Estate, the Court may authorize the same if the Debtor is not otherwise able to

obtain postpetition financing and there is adequate protection offered to the lienholder. *See id*. at §364(d)(1).

29. The Receiver submits that the terms of the Postpetition Financing are reasonable. Among other things, Frost has agreed to an interest rate of the Prime Rate, absent a default, which rate is presently 3.25%—an exceedingly favorable rate which the Receiver could never obtain otherwise. The default interest rate is the Prime Rate plus 5%. The term of the Postpetition Financing is October 15, 2013—which is reasonable because this will provide the Receiver with approximately six (6) months during which to engage in a going concern sale or orderly liquidation, which period the Receiver believes is sufficient to enable the Debtor to maximize the value of the property of the Estate.

30. With respect to the proposed Postpetition Collateral, the Postpetition Collateral includes property of the Debtor which already consists of the Prepetition Collateral, and Frost consents to the same. Neither Southwest, with respect to the Real Property, nor any *ad valorem* taxing authority with a tax lien against property of the Debtor or the Estate would be primed. Thus, the requirements of section 364 of the Bankruptcy Code are satisfied. With respect to Postpetition Collateral that does not already form part of the Prepetition Collateral, the primary assets are business torts in which no creditor presently holds a perfected security interest. As such, the granting of a lien to Frost to secure the Postpetition Financing is authorized by section 364(c)(2) of the Bankruptcy Code.

31. Part of the relief to be requested at a final hearing on the Motion is a roll-up of the pre-petition indebtedness of the Debtor to Frost into the post-petition indebtedness.

C.   **ADEQUATE PROTECTION AND CARVEOUT**

32.   In addition to the Postpetition Collateral, the Receiver proposes to grant Frost adequate protection in the form of: (i) a superpriority administrative claim; and (ii) a diminution and replacement claim and lien, to the extent of any diminution in the value of the Prepetition Collateral. On an interim basis, such diminution lien is proposed to apply to Chapter 5 causes of action. These protections are expressly provided for in section 507(b) of the Bankruptcy Code and section 361(2) of the Bankruptcy Code. The Receiver further submits that these protections are ordinary and customary. These protections and the Postpetition Collateral would be subject to a carveout in the amount of $150,000.00 for the Interim Period such that said funds would be available to pay U.S. Trustee fees and the Receiver's and the Debtor's professional fees and expenses, to the extent otherwise allowed by the Court.

D.   **INTERIM RELIEF**

33.   The Receiver recognizes that, for the first fourteen (14) days after the Petition Date, the Court may authorize the use of Cash Collateral and the Postpetition Financing only on an interim basis, and only to "avoid immediate and irreparable harm to the estate." FED. R. BANKR. P. 4001(b)(2) and (c)(2). For the reasons stated above, and as will be demonstrated by the evidence, a refusal to permit the Debtor to use Cash Collateral or to obtain the Postpetition Financing for said fourteen (14) days will lead to immediate and irreparable injury, since the Debtor cannot go fourteen days without paying employees, utilities, security, professionals, and the various other expenses listed on the Budget. The Receiver believes that the result would likely be a loss of potentially substantial value, or relief from the automatic stay to foreclose on its liens and security interests, which would likely leave no value for unsecured creditors.

E.   SERVICE OF POSTPETITION FINANCING DOCUMENTS

34. Due to their length and the desire to save significant service expenses, the Receiver is not serving the Postpetition Financing Documents on all parties otherwise served with this Motion. Any party that wishes to obtain a copy thereof may do so free of charge by contacting Davor Rukavina at drukavina@munsch.com or at (214) 855-7587.

V.   **PRAYER**

WHEREFORE, PREMISES CONSIDERED, the Receiver, for himself and for the Debtor, respectfully requests that the Court enter an order: (i) granting this Motion; (ii) authorizing the Debtor's usage of Cash Collateral during the Interim Period; (iii) authorizing the Debtor to obtain the Postpetition Financing and to execute and deliver to Frost the Postpetition Financing Documents; (iv) scheduling a final hearing on this Motion; and (v) granting the Receiver and the Debtor such other and further relief to which they may be entitled.

RESPECTFULLY SUBMITTED this 16th day of April, 2013.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Deborah M. Perry
　　Deborah M. Perry
　　Texas Bar No. 24002755
　　Davor Rukavina
　　Texas Bar No. 24030781
　　Jonathan L. Howell
　　Texas Bar No. 24053668
　　3800 Lincoln Plaza
　　500 N. Akard Street
　　Dallas, Texas  75201-6659
　　Telephone: (214) 855-7500
　　Facsimile: (214) 855-7584

**PROPOSED ATTORNEYS FOR THE
RECEIVER/DEBTOR-IN-POSSESSION**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 16th day of April, 2013, she caused true and correct copies of this document, with Exhibit a thereto and the proposed order thereon, to be served by e-mail on the parties listed below, by U.S. first class mail, postage prepaid, on the parties listed on the attached Matrix, and by facsimile on the parties listed below.

US Trustee (John.M.Vardeman@usdoj.gov)
Will Medford, Esq. (wmedford@qslwm.com)
Arnie Cavazos, Esq. (acavazos@chfirm.com)

| | | |
|---|---|---|
| Age Industries, Ltd. 817-641-2509 | City of Laredo Tax Department 956-791-7394 | Dallas Container Corp. 214-381-8279 |
| EVAULT, Inc. 415-432-2205 | Frost Bank c/o Michael J. Quilling 214-871-2111 | Inovar Packaging Group 817-275-2770 |
| Masterank America Inc. 949-719-9868 | JAS Forwarding (USA), Inc. 770-688-1229 | MP2 Energy Texas 832-510-1128 |
| Ungerer & Company 973-628-0251 | Webb County Tax Assessor-Collector 956-523-5050 | Staff Force Personnel Services 214-634-0238 |
| United I.S.D. Tax Office 956-473-7948 | Walgreens Credit and Collections 217-554-8673 | Zibo Intrue Light Industrial Products 86-533-6280669 |
| John Vardeman Office of the US Trustee 903-590-1461 | | |

By: /s/ Deborah M. Perry
Deborah M. Perry

**EMERGENCY MOTION FOR INTERIM AND FINAL: (I) AUTHORITY TO OBTAIN SECURED POSTPETITION FINANCING; AND (II) USAGE OF CASH COLLATERAL – Page 13**