

# LOAN AGREEMENT

Borrower:  Domistyle, Inc.        Lender:  Frost Bank
Address:   4835 LBJ Freeway, Suite 800    Address: P.O. Box 1600
           Dallas, Texas                  San Antonio, Texas  78296

**THIS LOAN AGREEMENT** (this "Loan Agreement") is dated April __, 2013 by and between Borrower and Lender.

ARTICLE I

Definitions and Use of Terms

Section 1.01.  Certain Definitions.   As used herein, the following terms have the meanings indicated, unless the context otherwise requires:

"Accounts" means any right of Borrower to payment for goods sold or leased or for services rendered, but shall not include interest or service charges.

"Account Debtor" means a Person who is obligated on or under an Account.

"Advance" means a disbursement by Lender of any of the proceeds of a Loan.

"Affiliate" means any individual or entity directly or indirectly controlling, controlled by, or under common control with, another individual or entity.

"Applicable Bankruptcy Law" means the United States Bankruptcy Code or any other present or future insolvency, bankruptcy, liquidation, conservatorship, reorganization or moratorium Governmental Requirement or other similar Governmental Requirements.

"Bankruptcy Code" means the United States Bankruptcy Code, as in effect from time to time.

"Budget" means a thirteen-week cash flow budget on a receipts and disbursements basis satisfactory in form and substance to Lender, which is attached hereto as Exhibit "A".

"Business Day" means a day other than a Saturday, Sunday or a day on which commercial banks in the State of Texas are authorized to be closed, or are in fact closed.

"Closing Date" means the later of the date of this Loan Agreement or the date of entry of the Interim Order.

"Code" means the Internal Revenue Code of 1986, as amended, and the regulations promulgated and rulings issued thereunder.

EXHIBIT "D"

"Collateral" means any and all assets, Property and rights and interests in or to Property of Borrower, whether tangible or intangible, in which a Lien is granted or purported to be granted pursuant to the Loan Documents, including, without limitation, all of the following property and interests in property of Borrower, wherever located and whether now or hereafter existing or now owned or hereafter acquired or arising, and whether constituting pre-petition property or post-petition property: (i) all Receivables; (ii) all Inventory; (iii) all Equipment; (iv) all Contract Rights; (v) all General Intangibles; (vi) all Investment Property; (vii) each Deposit Account and all certificates of deposit maintained with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a certificate of deposit that is an instrument under the UCC; (viii) all goods and other property, whether or not delivered, (a) the sale or lease of which gives or purports to give rise to any Receivable, including, but not limited to, all merchandise returned or rejected by or repossessed from customers, or (b) securing any Receivable, including, without limitation, all rights as an unpaid vendor or lienor (including, without limitation, stoppage in transit, replevin and reclamation) with respect to such goods and other property; (ix) all mortgages, deeds to secure debt and deeds of trust on real or personal property, guaranties, leases, security agreements, and other agreements and property which secure or relate to any Receivable or other Collateral, or are acquired for the purpose of securing and enforcing any item thereof; (x) all documents of title, policies and certificates of insurance, securities, chattel paper (including electronic chattel paper and tangible chattel paper) and other documents and instruments; (xi) all other goods and personal property, whether tangible or intangible, wherever located, including money, supporting obligations, letters of credit, and each Letter-of-credit right; (xii) all files, correspondence, computer programs, tapes, discs and related data processing software which contain information identifying or pertaining to any of the Receivables, or any Account Debtor, or showing the amounts thereof or payments thereon or otherwise necessary or helpful in the realization thereon or the collection thereof; (xiii) any "commercial tort claims" as that term is defined in the UCC, as set forth in the Security Agreement executed by Borrower in favor of Lender; (xiv) any and all claims and/or causes of action existing under the Bankruptcy Code, including, but not limited to, claims and/or causes of action arising under Sections 542, 544, 547, 548, 549 and/or 550 of the Bankruptcy Code (collectively the "Avoidance Actions"); and (xv) any and all products and proceeds of the foregoing (including, but not limited to, any claim to any item referred to in this definition, and any claim against any third party for loss of, damage to or destruction of any or all of, the Collateral or for proceeds payable under, or unearned premiums with respect to, policies of insurance) in whatever form, including, but not limited to, cash, negotiable instruments and other instruments for the payment of money, chattel paper, security agreements and other documents.

"Deeds of Trust" means, collectively, mortgages, deeds to secure, deeds of trust, leasehold mortgages, leasehold deeds to secure, leasehold deeds of trust or other security documents or instruments of a similar nature which create a Lien or security interest from time to time in, to or covering the Property or any other property of Borrower to secure the Obligations, including any modifications, amendments, supplements, ratifications, and restatements thereto.

"Default" means any event or circumstance that constitutes an Event of Default or, that with, the lapse of time, would (if not cured or otherwise remedied during such time) constitute an Event of Default.

"DIP Orders" shall mean the Interim Order and the Final Order entered by the Bankruptcy Court or any other court of competent jurisdiction.

"<u>Distributions</u>" means all dividends and other distributions made by a Person to its equity holders.

"<u>Environmental Laws</u>" means any and all Federal, state, local, and foreign Governmental Requirements, judgments, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the protection of health and the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended.

"<u>ERISA Affiliate</u>" means any trade or business (whether or not incorporated) under common control with Borrower within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"<u>ERISA Event</u>" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a Plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; or (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon Borrower or any ERISA Affiliate.

"<u>Estate</u>" means the bankruptcy estate of Borrower created pursuant to 11 U.S.C. § 541(a).

"<u>Event of Default</u>" has the meaning set forth in <u>Article IX</u>.

"<u>Final Order</u>" shall mean the order entered after a final hearing under Bankruptcy Rule 4001(c)(2), pursuant to Section 364(c) and (d) of the Bankruptcy Code, as to which no stay pending appeal has been entered, and no motion to reconsider filed, and which has not been vacated, modified or reversed, (i) authorizing the Borrower to incur post-petition secured indebtedness and to grant Liens in accordance with this Loan Agreement and the other Loan Documents, (ii) providing for the super-priority of the Obligations, including without limitation, a specific grant of a security interest to Lender in all Collateral, as well as the right to the proceeds from all Collateral in accordance with this Loan Agreement and the other Loan Documents, (iii) providing "adequate protection" pursuant to Section 364(d) of the Bankruptcy Code to such creditors whose liens have been primed, and (iv) authorizing the payment by the Borrower of all fees and expenses contemplated by this Loan Agreement and the other Loan Documents, and in all respects to be satisfactory to Lender.

"Financial Statements" means financial information of Borrower, as required herein and as, at the time in question, have been most recently furnished to Lender.

"GAAP" means generally accepted accounting principles in the United States set forth in the statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"Governmental Authority" means the United States, the state, the county, the city or any other political subdivision in which the Property is located, and any court or political subdivision, agency, or instrumentality having jurisdiction over Borrower or the Property, domestic or foreign.

"Governmental Requirements" means all constitutions, statutes, laws, ordinances, rules, regulations, orders, writs, injunctions or decrees of any Governmental Authority applicable to Borrower or the Property.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Improvements" means any and all buildings, covered garages, air conditioning towers, open parking areas, structures and other improvements of any kind or nature, and any and all additions, alterations, betterments or appurtenances thereto, now or at any time hereafter situated, placed or constructed upon the Land or any part thereof.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:  (a) all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments; and (b) indebtedness (excluding prepaid interest thereon) secured by a Lien on Property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness will have been assumed by such Person or is limited in recourse.  For all purposes hereof, the Indebtedness of any Person will include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.

"Information" means all information received from Borrower, other than any such information that is available to Lender on a nonconfidential basis prior to disclosure by Borrower, provided that, in the case of information received from Borrower after the Closing Date, such information is clearly identified at the time of delivery as confidential.

"IRS" means the United States Internal Revenue Service.

"Interim Order" shall mean the order entered pursuant to Section 364(c) and (d) of the Bankruptcy Code and Bankruptcy Rule 4001(c), as to which no stay pending appeal, has been entered, and which Interim Order has not been vacated, modified or reversed, (i) authorizing the Borrower to incur post-petition secured indebtedness and to grant Liens in accordance with this Loan Agreement and the other Loan Documents, (ii) providing for the super-priority of the Obligations, including without limitation, a specific grant of a security interest to Lender in all Collateral, as well as the right to the proceeds from all Collateral in accordance with this Loan Agreement and the other Loan Documents, (iii) providing "adequate protection" pursuant to Section 364(d) of the Bankruptcy Code to such creditors whose Liens have been primed, and (iv) authorizing the payment by the Borrower of all fees and expenses contemplated by this Loan Agreement and the other Loan Documents, each on an interim basis and as set forth in such order, and in all respects to be satisfactory to Lender.

"Land" means the real estate described in Schedule 1.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, and any financing lease having substantially the same economic effect as any of the foregoing).

"Loans" are defined in Section 2.01, each individually a "Loan".

"Loan Documents" means this Loan Agreement, the Notes, all Deeds of Trust, all Security Agreements, and such other documents, instruments and agreements, evidencing, securing or pertaining to the Obligations as will from time to time be executed and delivered to Lender by Borrower or any other party pursuant to this Loan Agreement, and any future amendments, restatements, modifications, ratifications, confirmations, extensions or supplements hereto or thereto including those documents ratified herein.

"Managerial Official" means, with respect to any Person, an officer or a governing Person of such Person.

"Material Adverse Change" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, prospects, properties, assets, liabilities (actual or contingent), condition (financial or otherwise) of Borrower; (b) a material impairment of the ability of the Borrower to perform its obligations under any Loan Document to which it is a party; (c) a material adverse effect upon the legality, validity, binding effect or enforceability against Borrower of any Loan Document to which it is a party or the rights of Lender under any Loan Document; or (d) a material restatement or revision of a previously submitted financial statement pursuant to an audit.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"Notes" means, collectively, the Revolving Credit Note and any renewals, extensions, modifications, refinancings, consolidations and substitutions thereof.

5

"Obligated Party" means any party other than Borrower who secures, guarantees and/or is otherwise obligated to pay all or any portion of the Obligations.

"Obligations" mean all present and future Indebtedness, obligations and liabilities of Borrower to Lender arising pursuant to the Loans, this Loan Agreement or any of the other Loan Documents or otherwise, and any renewals, extensions, increases, or amendments thereof, or any part thereof, regardless of whether such Indebtedness, obligations and liabilities are direct, indirect, fixed, contingent, liquidated, unliquidated, joint, several or joint and several and including interest and fees that accrue after the commencement by or against Borrower of any proceeding under any Applicable Bankruptcy Law naming Borrower as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

"Patriot Act" is defined in Section 5.05.

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by Borrower or any ERISA Affiliate or to which Borrower or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"Person" means any individual, firm, corporation, association, partnership, joint venture, trust, entity, unincorporated organization or Governmental Authority.

"Petition Date" means the date that Borrower commences a case under the Bankruptcy Code.

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by Borrower or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate.

"Post-Petition" means any event, matter or item that arose on or after the Petition Date.

"Pre-Petition" means any event, matter or item that arose prior to the Petition Date.

"Pre-Petition Debt" shall mean all indebtedness, liabilities, and obligations in connection with the Pre-Petition Loan Agreement and the Pre-Petition Loan Documents owed by the Borrower to Lender as of the Petition Date, whether direct or indirect, absolute or contingent, primary or secondary, due or to be come due, including all interest thereon accruing after the Petition Date and all reasonable legal fees and collection expenses heretofore incurred by Lender in collecting any of such indebtedness, liabilities or obligations, as reduced by payments applied thereto after the Petition Date.

"Pre-Petition Liens" means the Liens against the property of Borrower described in the Pre-Petition Loan Agreement and the Pre-Petition Loan Documents granted to Lender by Borrower in each case as security for the payment and performance of the Borrower's

obligations under or in connection with the Pre-Petition Loan Agreement and the Pre-Petition Loan Documents, and Pre-Petition Debt.

"Pre-Petition Loan Agreement" means that certain Loan Agreement executed by and between Borrower and Lender, dated August 17, 2011, as amended.

"Pre-Petition Loan Documents" shall mean the Pre-Petition Loan Agreement, the and all other "Loan Documents" as such term is defined and used in the Pre-Petition Loan Agreement, but which term shall not include those documents included in the term "Loan Documents" as defined herein.

"Property" means the Land, the Improvements and all other property, whether real or personal, tangible or intangible, including the Collateral.

"Reorganization Plan" shall mean a plan of reorganization proposed by Borrower or any other Person in the Bankruptcy Case.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

"Revolving Credit Commitment" is defined in Section 2.01(a).

"Revolving Credit Loans" is defined in Section 2.01(a).

"Revolving Credit Note" means a promissory note executed by Borrower and payable to the order of Lender, evidencing the Revolving Credit Loans made by Lender, as the same may be amended, restated, supplemented, modified, extended or increased from time to time.

"Security Agreements" means, collectively, (a) the Security Agreement executed by Borrower, in form and substance satisfactory to Lender, creating a Lien in favor of Lender, (b) those Security Agreements executed by the Borrower in connection with the Pre-Petition Loan Documents, as ratified herein, and (c) any security agreement executed by any Person in connection with this Loan Agreement, as each may be amended, modified, ratified, supplemented, restated or replaced from time to time.

"Subordinated Debt" means any Indebtedness owing by Borrower which has been subordinated by written agreement to all Indebtedness now or hereafter owing by Borrower to Lender, such agreement to be in form and substance satisfactory to Lender.

"Termination Date" means with respect to the Revolving Credit Loans, the maturity date stated in the Revolving Credit Note.

"UCC" means the Uniform Commercial Code of the State of Texas or of any other state having jurisdiction with respect to any of the rights and remedies of Lender under the Loan Documents, as amended.

"Unfunded Pension Liability" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's

assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

Headings.  The headings, captions, and arrangements used in any of the Loan Documents are, unless specified otherwise, for convenience only and will not be deemed to limit, amplify, or modify the terms of the Loan Documents nor to affect the meaning thereof.

Section 1.02.  Number and Gender of Words.  Whenever herein the singular number is used, the same will include the plural where appropriate, and words of any gender will include each other gender where appropriate.

Section 1.03.  Money.  Unless stipulated otherwise, all references herein or in any of the Loan Documents to "Dollars," "money," "payments," or other similar financial or monetary terms are references to currency of the United States of America.

Section 1.04.  Articles, Sections and Exhibits.  All references herein to Articles and Sections are, unless specified otherwise, references to articles and sections of this Loan Agreement.  All references herein to an "Exhibit," "Annex" or "Schedule" are references to exhibits, annexes or schedules attached hereto, all of which are made a part hereof for all purposes, the same as if set forth herein verbatim, it being understood that if any exhibit, annex or schedule attached hereto, which is to be executed and delivered, contains blanks, the same will be completed correctly and in accordance with the terms and provisions contained and as contemplated herein prior to or at the time of the execution and delivery thereof.  The words "herein," "hereof," "hereunder" and other similar compounds of the word "here" when used in this Loan Agreement will refer to the entire Loan Agreement and not to any particular provision or section.

Section 1.05.  Accounting Terms.  Unless otherwise specified, all accounting and financial terms and covenants set forth above and in Article VIII are to be determined according to GAAP.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either Borrower or Lender will so request, Lender and Borrower will negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of Lender), provided that, until so amended, (a) such ratio or requirement will continue to be computed in accordance with GAAP prior to such change therein and (b) Borrower will provide to Lender financial statements and other documents required under this Loan Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

ARTICLE II

Loans

Section 2.01.  Loans.  Subject to the terms and conditions set forth in this Loan Agreement and the other Loan Documents, Lender hereby agrees to provide to Borrower the following credit facilities:

(a)  Revolving Credit Loans.  Lender agrees to lend to Borrower, on a revolving basis from time to time during the period commencing on the Closing Date and

8

continuing through the Termination Date, such amounts as Borrower may request hereunder (the "Revolving Credit Loans"); provided, however, the total principal amount outstanding at any time will not exceed $21,709,061 (the "Revolving Credit Commitment"); and provided, further, that the initial advance shall not exceed $250,000 (the "Initial Advance").    Subject to the terms and conditions hereof, Borrower may borrow, repay and reborrow hereunder.

All Revolving Credit Loans will be collectively called the "Loans".  Lender reserves the right to require Borrower to give Lender not less than one Business Day prior notice of each requested Advance specifying (1) the aggregate amount of such requested Advance, (2) the requested date of such Advance, and (3) the purpose for such Advance, with such Advances to be requested in a form satisfactory to Lender.

Section 2.02.   Promissory Notes.  The Loans will be evidenced by one or more Notes. Interest on the Notes will accrue at the rate set forth therein.  The principal of and interest on the Notes will be due and payable in accordance with the terms and conditions set forth in the Notes and in this Loan Agreement.

Section 2.03.   Priority of All Advances and Loans.   All advances and loans made hereunder by Lender to Borrower shall constitute and be deemed a cost and expense of administration in the Bankruptcy Case and shall be entitled to priority under Section 364(c)(1), Section 364(c)(2), Section 364(c)(3),  and Section 364(d) of the Bankruptcy Code ahead of all other costs and expenses of administration of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b) or 726 of the Bankruptcy Code, except as may be otherwise provided in the DIP Orders.

Section 2.04.   Prohibition Against Surcharge.  Except as expressly provided in the DIP Orders, no expenses, costs or charges shall be charged against the Collateral or Lender under Section 506(c) of the Bankruptcy Code and Borrower hereby waives any rights it has to seek such charges under Section 506(c) of the Bankruptcy Code.

Section 2.05.   Credit Bid.  Borrower hereby acknowledges and agrees that Lender has the absolute right to credit bid any and/or all the Obligations at any sale of all or any portion of the Collateral and/or any other asset of the Borrower.  Borrower agrees not to object or otherwise dispute any credit bid of Lender and further agrees to support and assert Lender's right to credit bid.

Section 2.06.   Lock Box.       (a) Prior to final payment in full of all Obligations and the termination of all obligations of Lender to extend credit pursuant to the Loan Documents, Borrower agrees that all sums payable by any Account Debtor to Borrower in payment of or on account of any of Borrower's Accounts shall be deposited in bank account no. 0980036137 with Lender styled "Frost Bank (Special Lockbox Account)" (the "Special Account") and governed by this Loan Agreement.  Lender alone has power of withdrawal over and control of the Special Account, provided that so long as no Event of Default exists, all funds on deposit in the Special Account shall be transferred on a daily basis to Borrower's deposit account no. 0980036129 at Lender.  Such sums shall be deposited in the form received, except for the endorsement of Borrower where necessary to permit collection of items, which endorsement Borrower agrees to make, and which Lender is also hereby authorized to make on Borrower's behalf.  All checks,

drafts, cash and other remittances and payment of or on account of any of Borrower's Accounts received by Borrower shall be received in trust for the benefit of Lender and shall be immediately deposited into the Special Account.  Borrower shall notify all of Borrower's present and future Account Debtors to send all of their sums payable in payment of or on account of their Accounts payable to Borrower to the Special Account.  During the existence of an Event of Default, Lender shall have the option, without any prior notice to Borrower, to apply any and all funds in the Special Account toward, in Lender's sole and absolute discretion, the payment of the Obligations to be applied in the manner and order as determined by Lender, with any balance remaining after payment in full of the Obligations to be held by Lender, subject to the written instructions of Borrower.

(b)     Borrower appoints Lender and any officer or agent thereof, with full power of substitution, as its true and lawful attorney–in–fact with full irrevocable power and authority in the place and stead of Borrower and in the name of Borrower or in its own name, for the purpose of carrying out the terms of the Loan Documents, to take any and all action to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of the Loan Documents, including, without limitation, to take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of any Accounts or with respect to any other Collateral or to direct any Account Debtor to make payment of any Account directly to Lender or as Lender shall direct.

## ARTICLE III

### Pre-Petition Debt and Liens.

Section 3.01.   Pre-Petition Debt.  Borrower hereby represents, acknowledges and agrees that as of the Petition Date, the total sum owed to Lender is: (i) $21,209,061 in addition to (ii) all interest as it continues to accrue at the default interest rate, and (iii) all fees and costs incurred by Lender including any out-of-pocket fees and expenses of counsel or other professionals retained by or on behalf of Lender in connection with its efforts to collect the amounts owed by Borrower.

Sectrion 3.02.   Pre-Petition Liens.  Borrower represents, acknowledges and agrees that the Lender's Pre-Petition Liens represent valid and perfected first priority liens upon and security interests in all of the Borrower's property to the extent and amount of the indebtedness (as such continues to accrue).

## ARTICLE IV

### Conditions Precedent

Section 4.01.   Initial Extension of Credit.  The obligation of Lender to make the initial Advances is subject to the condition precedent that Lender will have received on or before the day of such Advances, each dated (unless otherwise indicated) the Closing Date, in form and substance satisfactory to Lender and the following conditions shall have occurred:

(a)     the Interim Order, in form and substance satisfactory to Lender, shall have been entered by the Bankruptcy Court, shall be in full force and effect and shall not have been

vacated, reversed, modified, appealed stayed or subject to any motion to reconsider in any respect;

(b)      The representations and warranties contained in this Agreement and in each of the other Loan Documents shall be true on and as of the date of the signing of this Agreement and on the date of each extension of credit or the making of any Loans pursuant to this Agreement, with the same effect as though such representations and warranties had been made on and as of each such date, and on each such date, no Event of Default, and no condition, event or act which with the giving of notice or the passage of time or both would constitute an Event of Default, shall have occurred and be continuing or shall exist;

(c)      There shall be no Material Adverse Change, as determined by Lender in its discretion, in the financial condition or business of Borrower nor any material decline, as determined by Lender in its discretion, in the market value of any Collateral or a substantial or material portion of the assets of Borrower, and no change or event shall have occurred which would impair the ability of the Borrower to perform its obligations hereunder or under any of the other Loan Documents to which it is a party or of Lender to enforce the Obligations or realize upon the Collateral, other than the filing of the Bankruptcy Case and the financial history described in the motion to approve the DIP orders;

(d)      Lender shall have received the Budget;

(e)      Lender shall have received this Loan Agreement and all other Loan Documents and all instruments and documents to be delivered hereunder and thereunder by the date hereof, each of which shall have been duly executed by all respective parties thereto and each of which shall be in full force and effect and in form and substance satisfactory to Lender; and

(f)      Lender will have received such additional approvals, opinions, instruments or documents as Lender or its legal counsel may request.

Section 4.02.   <u>Conditions to Subsequent Extension of Credit</u>.  Notwithstanding any other provision of this Agreement or any of the other Loan Documents and without affecting in any manner the rights of Lender under other Sections of this Agreement, it is understood and agreed that any obligation of Lender making the Loans is subject to the satisfaction of all of the following conditions:

(a)      the Final Order, in form and substance satisfactory to Lender, shall have been entered by the Bankruptcy Court, shall be in full force and effect and shall not have been vacated, reversed, modified, appealed stayed or subject to any motion to reconsider in any respect;

(b)      The representations and warranties contained in this Loan Agreement and in each of the other Loan Documents shall be true on and as of the date of the signing of this Loan Agreement and on the date of each extension of credit or the making of any Advances pursuant to this Loan Agreement, with the same effect as though such representations and warranties had been made on and as of each such date, and on each such date, no Event of Default, and no condition, event or act which with the giving of notice or the passage of time or both would constitute an Event of Default, shall have occurred and be continuing or shall exist;

(c)     There shall be no material adverse change, as determined by Lender in its discretion, in the financial condition or business of Borrower, nor any material decline, as determined by Lender in its discretion, in the market value of any Collateral or a substantial or material portion of the assets of Borrower, and no change or event shall have occurred which would impair the ability of the Borrower to perform its obligations hereunder or under any of the other Loan Documents to which it is a party or of Lender to enforce the Obligations or realize upon the Collateral, other than the occurrence of the Petition Date and the financial history described in the motion to approve the DIP Orders;

(d)     Lender shall have received a request for an advance pursuant to Section 2.01 hereof;

(e)     each advance shall be for the purpose of funding the items set forth on the Budget to the extent authorized by the DIP Orders; and/or

(f)     the amount of the Obligations after giving effect to the requested Loan shall not exceed the Revolving Credit Commitment.

Each request for Advance hereunder submitted by Borrower will be deemed to be a representation and warranty that the conditions specified in Sections 4.02(b) and (c) have been satisfied on and as of the date of the applicable Advance.

ARTICLE V

Representations and Warranties

Borrower hereby represents and warrants, and upon each request for an Advance or the issuance of a Letter of Credit further represents and warrants, to Lender as follows:

Section 5.01.   Binding Obligations.   The execution, delivery, and performance of this Loan Agreement and all of the other Loan Documents by Borrower have been duly authorized by all necessary action by Borrower and constitute legal, valid and binding obligations of Borrower enforceable in accordance with their respective terms, except as enforcement of remedies may be limited by Applicable Bankruptcy Law.

Section 5.02.   Insurance.   Borrower and the Properties of Borrower are insured with financially sound and reputable insurance companies not Affiliates of Borrower in such amounts, with such deductibles and covering such risks required by Lender and in the absence of such requirements, as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where Borrower operates.

Section 5.03.   Disclosure.   Borrower has disclosed to Lender all agreements, documents, instruments and organizational documents or other restrictions to which it is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Change.   No report, financial statement, certificate or other information furnished (whether in writing or orally) by or on behalf of Borrower to Lender in connection with the transactions contemplated hereby and the negotiation of this Loan Agreement or delivered hereunder (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact

12

necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

Section 5.04.   Intellectual Property.   Borrower owns, or possesses the right to use, all of the trademarks, service marks, trade names, copyrights, patents, patent rights, franchises, licenses, slogans, other advertising products and processes, and other intellectual property rights that are reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other Person.   To the best knowledge of Borrower, no slogan or other advertising product, process or other material now used by Borrower infringes upon any rights held by any other Person.

Section 5.05.   Patriot Act.   All capitalized words and phrases and all defined terms used in the USA Patriot Act of 2001, 107 Public Law 56 (October 26, 2001) (the "Patriot Act") and in other statutes and all orders, rules and regulations of the United States government and its various executive department, agencies and offices related to the subject matter of the Patriot Act, including, but not limited to, Executive Order 13224 effective September 24, 2001, are hereinafter collectively referred to as the "Patriot Rules" and are incorporated into this section of the Loan Agreement.   Borrower represents and warrants to Lender that neither it nor any of its principals, shareholders, members, partners, or Affiliates, as applicable, is a Person named as a Specially Designated National and Blocked Person (as defined in Presidential Executive Order 13224) and that it is not acting, directly or indirectly, for or on behalf of any such Person. Borrower further represents and warrants to Lender that Borrower and its principals, shareholders, members, partners, or Affiliates, as applicable, are not, directly or indirectly, engaged in, nor facilitating, the transactions contemplated by this Loan Agreement on behalf of any Person named as a Specially Designated National and Blocked Person.   Borrower hereby agrees to defend, indemnify and hold harmless Lender from and against any and all claims, damages, losses, risks, liabilities, and expenses (including reasonable attorneys' fees and costs) arising from or related to any breach of the foregoing representations and warranties.

ARTICLE VI

Affirmative Covenants

Until (i) all Obligations are fully paid and satisfied, and (ii) the Revolving Credit Commitment has been terminated, Borrower agrees and covenants that it will:

Section 6.01.   Furnish to Lender:

(a)   Accounts Aging.   An Accounts aging report signed by a Managerial Official of Borrower within ten (10) days after the end of each calendar month, in form and detail satisfactory to Lender.

(b)   Payables Aging.   An accounts payable aging report signed by a Managerial Official of Borrower within ten (10) days after the end of each calendar month, in form and detail satisfactory to Lender.

(c)     Inventory Listing.  A list of Borrower's inventory by location and type (to include the following:  raw materials, work in process, finished goods and any additional items Lender may reasonably request) within ten (10) days after the end of each calendar month, in form and detail satisfactory to Lender.

(d)     Tax Returns.  Copies of Borrower's income tax returns (federal and state, if any) within 30 days after the applicable filing date for the tax reporting period thereof, prepared by a tax professional satisfactory to Lender.

Section 6.02.   Notices.  Promptly notify Lender:

(a)     of the occurrence of any Default;

(b)     of any matter that has resulted or could reasonably be expected to result in a Material Adverse Change, including (i) breach or non-performance of, or any default under, a contractual obligation of Borrower; (ii) any dispute, litigation, investigation, proceeding or suspension between Borrower and any Governmental Authority; or (iii) the commencement of, or any material development in, any litigation or proceeding affecting Borrower;

(c)     of the occurrence of any ERISA Event;

(d)     of a change in name of Borrower or a change in the location of Borrower, or any Collateral, in each case, within 30 days prior to such change; and

(e)     of any material change in accounting policies or financial reporting practices by Borrower.

Each notice pursuant to this Section will be accompanied by a statement of a Managerial Official of Borrower setting forth details of the occurrence referred to therein and stating what action Borrower has taken and proposes to take with respect thereto.  Each notice pursuant to this Section will describe with particularity any and all provisions of this Loan Agreement and any other Loan Document that have been breached or affected thereby.

Section 6.03.   Accounts and Records.  Maintain its books and records in accordance with GAAP.

Section 6.04.   Preservation of Existence, Etc.  (a) Preserve, renew and maintain in full force and effect its legal existence and good standing under the Governmental Requirements of the jurisdiction of its organization and each state in which it is qualified to do business; and (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Change.

Section 6.05.   Maintenance of Properties.  (a) Maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted; (b) make all necessary repairs thereto and renewals and replacements thereof except where the failure to do so could not reasonably be expected to have a Material Adverse Change; (c) use the standard of care typical in the industry

in the operation and maintenance of its facilities; and (d) preserve or renew all of its registered patents, trademarks, trade names and service marks (including licenses thereof), except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Change.

Section 6.06.   <u>Maintenance of Insurance</u>.   Maintain with financially sound and reputable insurance companies not Affiliates of Borrower, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, including but not limited to, commercial property insurance, all risks property damage, commercial general liability, worker's compensation, business interruption and other insurance, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons and providing for not less than 30 days' prior notice to Lender of termination, lapse or cancellation of such insurance.   Each insurance policy will name Lender as "additional insured" and "mortgagee", as applicable.

Section 6.07.   <u>Right of Inspection</u>.   Permit Lender to (a) visit its properties and installations, (b) examine, audit and make and take away copies or reproductions of its books and records, and (c) discuss with its respective directors, partners, principal officers and independent auditors its respective businesses, assets, liabilities, financial positions, results of operations, and business prospects, at all reasonable times.   Borrower shall be responsible for the reasonable costs and expenses associated with such inspection.   To the extent Borrower maintains any records, including computer generated records and software programs for the generation of such records in the possession of a third party, Borrower will, to the extent such records constitute Collateral, (i) notify such third party of Lender's Lien in such records, (ii) cause such party to grant access to Lender to such records and (iii) provide Lender with copies of any records Lender may request, all at Borrower's sole cost and expense.

Section 6.08.   <u>Right to Additional Information</u>.   Furnish Lender with such additional information and statements, lists of assets and liabilities, statements of contingent liabilities, tax returns, and other reports and certificates with respect to Borrower's financial condition, business operations and compliance with the terms of the Loan Documents as Lender may request from time to time.

Section 6.09.   <u>Compliance with Governmental Requirements</u>.   Conduct its business in an orderly and efficient manner consistent with good business practices, and perform and comply with all Governmental Requirements applicable to Borrower and its business, operations and Property (including without limitation, all applicable Environmental Laws).

Section 6.10.   <u>Use of Proceeds</u>.   Borrower shall use the proceeds of all Revolving Credit Loans, and all other loans or accommodations made by Lender for Borrower for only those purposes described on the Budget without permitted variance, and not for any purpose prohibited by law or by the terms and conditions of this Loan Agreement or any of the Loan Documents or of the DIP Orders; and expressly excluding the investigation or prosecution of any claim and/or cause of action against Lender, including but not limited to any and/or all claims and causes of action arising under Sections 542, 544, 547, 548, 549 and/or 550 of the Bankruptcy Code; under a theory of equitable subordination or recharacterization; or that challenges Lender's Pre-Petition Liens, the Security Interest, the Pre-Petition Debt or the Obligations.   Borrower shall use the proceeds of the subsequent advance after entry of the Final Order to satisfy the Pre-Petition Debt.

Section 6.11.  <u>Compliance with the DIP Orders</u>.  Borrower shall, at all times, comply with all terms, conditions and provisions of the DIP Orders.

Section 6.12.  <u>Notice of Indebtedness</u>.  Promptly inform Lender of the creation, incurrence or assumption by Borrower of any actual or contingent liabilities not permitted under this Loan Agreement or any other Loan Document.

Section 6.13.  <u>Additional Documents</u>.  Execute and deliver, or cause to be executed and delivered, to Lender, from time to time as required by Lender, any and all other agreements, instruments and documents which Lender may reasonably request in order to provide the rights and remedies to Lender granted or provided for by the Loan Documents or give effect to the transactions contemplated under this Loan Agreement and the other Loan Documents.

Section 6.14.  <u>Lender as Principal Depository</u>.  Maintain with Lender primary deposit accounts, including business, cash management, operations and administrative deposit accounts.

ARTICLE VII

<u>Negative Covenants</u>

Until (i) all Obligations are fully paid and satisfied, and (ii) the Revolving Credit Commitment has been terminated in full, Borrower will not directly or indirectly:

Section 7.01.  <u>Consent to Amendment of DIP Orders</u>.  Borrower shall not seek to amend, supplement or modify any of the terms of the Interim Order or the Final Order.

Section 7.02.  <u>Other Court Filings and Applications</u>.  Borrower shall not apply to the Bankruptcy Court for authority to use "cash collateral" or to take any action that is prohibited by the terms of any of the Loan Documents or otherwise refrain from taking any action that is required to be taken by the terms of any of the Loan Documents or permit any debt or claim to be pari passu with or senior to any of the Obligations, except as provided by this Agreement or the DIP Orders or as otherwise consented to by Lender.

ARTICLE VIII

<u>Reserved</u>

ARTICLE IX

<u>Events of Default</u>

Section 9.01.  <u>Events of Default</u>.  Each of the following will constitute an "Event of Default" under this Loan Agreement:

(a)    The bringing of a motion by Borrower to obtain additional financing from a party other than Lender under Section 364 of the Bankruptcy Code unless the proceeds from such financing are used to immediately repay in cash all Obligations under this Loan Agreement or to use "cash collateral" of Lender under Section 363(c) of the Bankruptcy Code in a manner and to the extent not otherwise consented to by Lender;

(b)     Other than Milo H. Segner, Jr., a trustee shall be appointed or a responsible officer or an examiner with expanded powers shall be appointed (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code and the order appointing such trustee, responsible officer, or examiner shall not have been stayed, reversed or vacated within thirty (30) days after the entry thereof; Borrower shall seek confirmation by the Bankruptcy Court of or the Bankruptcy Court shall confirm any Reorganization Plan that proposes to treat the Obligations in any manner other than payment-in-full on the date of confirmation, other than a Reorganization Plan proposed or accepted in writing by Lender, Borrower shall file any motion to alter, amend, vacate, supplement, modify, or reconsider, in any respect, any DIP Order or, without Lender's prior written consent; the Bankruptcy Court shall grant super-priority claim status pursuant to Section 364(c)(1) of the Bankruptcy Code to any Person other than to Lender; or Borrower shall challenge the validity, extent, priority or enforceability of any of the Pre-Petition Loan Documents or Pre-Petition Debt;

(c)     the dismissal of the Borrower's bankruptcy case, or the conversion of the Borrower's bankruptcy case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code;

(d)     the entry of an Order by the Bankruptcy Court granting relief from or modifying the Automatic Stay (i) to allow any creditor to execute upon or enforce a Lien on any Collateral, or (ii) with respect to any Lien of or to permit the granting of any Lien on any Collateral to any State or local environmental or regulatory agency or authority;

(e)     the commencement of a suit or action against Lender that asserts, by or on behalf of Borrower, the Environmental Protection Agency, any state environmental protection or health and safety agency or any official committee, any creditor, or any other party-in-interest in the Borrower's bankruptcy case, any claim or legal or equitable remedy which seeks the avoidance or subordination of the Obligations, the Security Interest, the Pre-Petition Debt and/or the Lender's Pre-Petition Lien;

(f)     the material and adverse modification of any DIP Order authorizing Borrower to execute this Loan Agreement and the other Loan Documents;

(g)     if Borrower makes any payment on account of debt or claim, or on account of any interest, principal, premium or otherwise, except (i) as expressly permitted by this Loan Agreement or by the DIP Orders, or (ii) as set forth in the Budget;

(h)     any covenant, agreement or obligation of Borrower contained in or evidenced by any of the Loan Documents shall cease to be enforceable or shall be determined by a court of competent jurisdiction to be unenforceable in accordance with its terms or the Borrower shall file a pleading with the Bankruptcy Court asserting the same; the Borrower shall deny or disaffirm their obligations under any of the Loan Documents or Security Interest granted in connection therewith or ratified or reaffirmed thereby; or any Security Interest in any of the Collateral granted under the Loan Documents shall be determined by a court of competent jurisdiction to be voidable,

invalid or unperfected, or subordinated or not given the priority contemplated by this Loan Agreement;

(i)      Borrower fails to file, within four (4) months of the entry of the Interim Order, a motion, in form and substance acceptable to Lender, for authority to sell all or substantially all of its assets to the highest bidder (or to a stalking horse bidder subject to higher and better offers), which motion shall acknowledge Lender's right to credit bid;

(j)      Borrower fails to consummate a sale of all or substantially all of its assets to the highest bidder after auction, with the Security Interest attaching to the proceeds thereof, within six (6) months of the entry of the Interim Order unless Lender provides prior written consent otherwise; and/or

(k)      Borrower exceeds, for any given period, the disbursements set forth in the Budget, whether collectively or for any given line item without the prior written consent of Lender.

(l)       The failure of Borrower, to timely and properly observe, keep or perform any covenant, agreement or condition required in Sections 6.01 and 6.02 and Article VII.

(m)      The failure of Borrower to timely and properly observe, keep or perform any covenant, agreement or condition required herein or in any of the other Loan Documents.

(n)      Any representation or warranty contained herein, in any of the other Loan Documents or in any other document ever delivered or furnished by Borrower to Lender in connection with the Obligations is or proves to have been false, misleading, erroneous or breached in any material respect.

(o)      The occurrence of a Material Adverse Change.

(p)      The occurrence of an ERISA Event.

Nothing contained in this Loan Agreement will be construed to limit the events of default enumerated in any of the other Loan Documents and all such events of default will be cumulative.

Section 9.02.   Remedies.   Upon the occurrence of any Event of Default, (a) the entire unpaid balance of principal of the Notes, together with all accrued but unpaid interest thereon, and all other Indebtedness owing to Lender by Borrower at such time will, at the option of Lender, become immediately due and payable without further notice, demand, presentation, notice of dishonor, notice of intent to accelerate, notice of acceleration, protest or notice of protest of any kind, all of which are expressly waived by Borrower, (b) Lender may, at its option, cease further Advances under any of the Notes, (c) reduce any claim to judgment, and (d) exercise any and all rights and remedies afforded by any of the Loan Documents, or by law or equity or otherwise, as Lender will deem appropriate.   All rights and remedies of Lender set forth in this Loan Agreement and in any of the other Loan Documents may be exercised by Lender at its option and in its sole discretion, upon the occurrence of an Event of Default.

Section 9.03.   Right of Setoff.   If an Event of Default shall have occurred and be continuing, Lender and its Affiliates are hereby authorized at any time and from time to time, to the fullest extent not prohibited by applicable Governmental Requirements, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by Lender or any such Affiliate to or for the credit or the account of Borrower against any and all of the Obligations now or hereafter existing under this Loan Agreement or any other Loan Document, irrespective of whether or not Lender shall have made any demand under this Loan Agreement or any other Loan Document and although the Obligations may be contingent or unmatured or are owed to a branch or office of Lender different from the branch or office holding such deposit or obligated on such Indebtedness.  The rights of Lender and its Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that Lender or its Affiliates may have.

Section 9.04.   Rights Cumulative; Election of Remedies.   All rights and remedies of Lender under the terms of this Loan Agreement will be cumulative of, and in addition to, the rights and remedies of Lender under any and all other agreements between Borrower and Lender (including, but not limited to, the other Loan Documents), and not in substitution or diminution of any rights and remedies now or hereafter held by Lender under the terms of any other agreement.  Such rights and remedies may be pursued separately, successively or concurrently against Borrower or any Property covered under the Loan Documents at the sole discretion of Lender.  The exercise or failure to exercise any of the same will not constitute a waiver or release thereof or of any other Right, and the same will be nonexclusive.

Section 9.05.   Waiver of Deficiency Statute.   In the event an interest in any of the Collateral is foreclosed upon pursuant to a judicial or nonjudicial foreclosure sale, Borrower agrees, notwithstanding the provisions of Sections 51.003, 51.004 and 51.005 of the Texas Property Code (as the same may be amended from time to time), and to the extent not prohibited by Governmental Requirements, that Lender shall be entitled to seek a deficiency judgment from Borrower equal to the difference between the Obligations and the amount for which the Collateral was sold pursuant to judicial or nonjudicial foreclosure sale.  Borrower acknowledges and agrees that this waiver creates an irrebuttable presumption that the foreclosure sale price is equal to the fair market value of the Collateral for purposes of calculating deficiencies owed by Borrower and others against whom recovery of a deficiency is sought.

ARTICLE X

Miscellaneous

Section 10.01. Waiver and Agreement.   Neither the failure nor any delay on the part of Lender to exercise any right, remedy, power or privilege herein or under any of the other Loan Documents will operate as a waiver thereof, nor will any single or partial exercise of such right, remedy, power or privilege preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  No waiver of any provision in this Loan Agreement or in any of the other Loan Documents will be effective unless the same will be in writing and signed by Lender, and then will be effective only in the specific instance and for the purpose for which given and to the extent specified in such writing.  No modification or amendment to this

Loan Agreement or to any of the other Loan Documents will be valid or effective unless the same is signed by the party against whom it is sought to be enforced.

Section 10.02. <u>Benefits</u>.   This Loan Agreement will be binding upon and inure to the benefit of Lender and Borrower, and their respective successors and assigns, provided, however, that Borrower may not, without the prior written consent of Lender, assign or encumber any interests, rights, remedies, powers, duties or obligations under this Loan Agreement or any of the other Loan Documents.

Section 10.03. <u>Notices</u>.

(a)    All notices, requests, demands or other communications required or permitted to be given pursuant to this Loan Agreement shall be in writing and given by (i) personal delivery, (ii) expedited delivery service with proof of delivery, or (iii) United States mail, postage prepaid, registered or certified mail, return receipt requested, sent to the intended addressee at the address set forth on the first page hereof and will be deemed to have been received either, in the case of personal delivery, as of the time of personal delivery, in the case of expedited delivery service, as of the date of first attempted delivery at the address and in the manner provided herein, or in the case of mail, upon deposit in a depository receptacle under the care and custody of the United States Postal Service.  Either party will have the right to change its address for notice hereunder to any other location within the continental United States by notice to the other party of such new address at least 30 days prior to the effective date of such new address.

(b)    Borrower and Lender agree that no notices or other communications by electronic means between such parties or their representatives in connection with this Loan Agreement or any instrument executed in connection herewith shall constitute a transaction, agreement, contract or electronic signature under the Electronic Signatures in Global and National Commerce Act, any version of the Uniform Electronic Transactions Act or any other statute governing electronic transactions, unless otherwise specifically agreed to in writing.

Section 10.04. <u>Continuation and Survival</u>.   All covenants, agreements, representations and warranties made in or pursuant to this Loan Agreement and the other Loan Documents will be deemed continuing and made at and as of the date of this Loan Agreement and at and as of all times thereafter.  All statements contained in any certificate, financial statement, legal opinion or other instrument delivered by or on behalf of Borrower pursuant to or in connection with any of the Loan Documents will constitute additional representations and warranties made under this Loan Agreement.  All covenants, agreements, representations and warranties made in or pursuant to this Loan Agreement and the other Loan Documents will survive until payment in full of all sums owing and performance of all other obligations hereunder by Borrower to Lender and will not be waived by the execution and delivery of this Loan Agreement or any Advance, any investigation by Lender or any other event except a specific written waiver by Lender.

Section 10.05. <u>Controlling Agreement</u>.   The parties hereto intend to conform strictly to the applicable usury Governmental Requirements.  In no event, whether by reason of demand for payment or acceleration of the maturity of the Obligations or otherwise, will the interest contracted for, charged or received by Lender hereunder or otherwise exceed the maximum

amount permissible under applicable Governmental Requirements.  If, from any circumstance whatsoever, interest would otherwise be payable to Lender in excess of the maximum lawful amount, the interest payable to Lender will be reduced automatically to the maximum amount permitted under applicable Governmental Requirements.  If Lender will ever receive anything of value deemed interest under applicable Governmental Requirements which would apart from this provision be in excess of the maximum lawful amount, an amount equal to any amount which would have been excessive interest will be applied to the reduction of the principal amount owing on the Obligations in the inverse order of its maturity and not to the payment of interest, or if such amount which would have been excessive interest exceeds the unpaid principal balance of the Obligations, such excess will be refunded to Borrower.  The interest and any other amounts that would have been payable in respect of any portion of the Obligations or during any period but were not payable as a result of the operation of this Section shall be cumulated and the interest and other amounts on any other portion of the Obligations or periods shall be increased (but not above the maximum amount permitted under applicable Governmental Requirement) until such cumulated amount shall have been received by Lender.  All interest paid or agreed to be paid to Lender will, to the extent permitted by applicable Governmental Requirements, be amortized, prorated, allocated and spread throughout the full stated term (including  any renewal or extension) of such Indebtedness so that the amount of interest on account of such Indebtedness does not exceed the maximum permitted by applicable Governmental Requirements.  The provisions of this Section will control all existing and future agreements between Borrower and Lender.

Section 10.06. <u>No Third Party Beneficiary</u>.  This Loan Agreement is for the sole benefit of Lender and Borrower and is not for the benefit of any third party.

Section 10.07. <u>Lender's Consent or Approval</u>.   Except where otherwise expressly provided in the Loan Documents, in any instance where the approval, consent or the exercise of judgment of Lender is required, the granting or denial of such approval or consent and the exercise of such judgment will be (a) within the sole discretion of Lender; and (b) deemed to have been given only by a specific writing intended for the purpose and executed by Lender.  Each provision for consent, approval, inspection, review, or verification by Lender is for Lender's own purposes and benefit only.

Section 10.08. <u>Applicable Governmental Requirements</u>.  This Loan Agreement and the other Loan Documents have been executed and delivered in the State of Texas, are performable in Bexar County, Texas, and will be governed by and construed in accordance with the Governmental Requirements of the State of Texas and the Governmental Requirements of the United States applicable to transactions within the State of Texas.  Except to the extent that the Governmental Requirements of the United States may apply to the terms hereof, the substantive Governmental Requirements of the State of Texas shall govern the validity, construction, enforcement and interpretation of this Loan Agreement and the other Loan Documents.  In the event of a dispute involving this Loan Agreement, any other Loan Document or any other instrument executed in connection herewith, Borrower irrevocably agrees that venue for such dispute shall lie in any court of competent jurisdiction in Bexar County, Texas.  To the extent that Chapter 303 of the Texas Finance Code is applicable to any Loan, any Advance or any Loan Document, the "WEEKLY CEILING" specified in such article is the applicable ceiling; provided that, if any applicable Governmental Requirement permits greater interest, the Governmental Requirement permitting the greatest interest will apply.

Section 10.09. <u>DIP Orders Control</u>.  This Agreement and the other Loan Documents are each subject to the terms and provisions contained in the DIP Orders to the same extent and effect as if the DIP Orders were fully set forth herein and therein; and in the event that any term or provision of this Agreement or any other Loan Document conflicts or is inconsistent with any term or provision of any DIP Order, the term and provision of the applicable DIP Order shall control and be given effect.

Section 10.10. <u>Time of Essence</u>.  Time will be of the essence in this Loan Agreement.

Section 10.11. <u>Patriot Act Notice</u>.  Lender hereby notifies Borrower that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow Lender to identify Borrower in accordance with the Act.

Section 10.12. <u>Invalid Provisions</u>.  If any provision of this Loan Agreement or any of the other Loan Documents is held to be illegal, invalid or unenforceable under present or future Governmental Requirements, such provision will be fully severable and the remaining provisions of this Loan Agreement or any of the other Loan Documents will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance.

Section 10.13. <u>Expenses of Lender</u>.  Borrower shall be obligated to pay Lender:  (a) all costs and expenses incurred by Lender in connection with the preparation, negotiation, execution and administration of this Loan Agreement and the other Loan Documents and any and all amendments, modifications, renewals, extensions, increases, and supplements thereof and thereto, including, without limitation, the fees and expenses of Lender's legal counsel and professionals, (b) all costs and expenses incurred by Lender in connection with the enforcement, workout or restructure of this Loan Agreement or any other Loan Document, including, without limitation, the fees and expenses of Lender's legal counsel and professionals, and (c) all other costs and expenses incurred by Lender in connection with this Loan Agreement or any other Loan Document, including, without limitation, all costs, expenses, taxes, assessments, filing fees, and other charges levied by a Governmental Authority or otherwise payable in respect of this Loan Agreement or any other Loan Document.

Section 10.14. <u>Participation of the Loans</u>.  Borrower agrees that Lender may, at its option, sell interests in the Loans and its rights and remedies under this Loan Agreement to one or more financial institutions or other Person acceptable to Lender and, in connection with each such sale, Lender may disclose any financial and other information available to Lender concerning Borrower to each prospective purchaser.

Section 10.15. <u>Counterparts; Facsimile Documents and Signatures</u>.  This Loan Agreement may be separately executed in any number of counterparts, each of which will be an original, but all of which, taken together, will be deemed to constitute one and the same instrument.  For purposes of negotiating and finalizing this Loan Agreement, if this document or any document executed in connection with it is transmitted by facsimile machine, electronic mail or other electronic transmission, it will be treated for all purposes as an original document. Additionally, the signature of any party on this document transmitted by way of a facsimile machine or electronic mail will be considered for all purposes as an original signature.  Any such transmitted document will be considered to have the same binding legal effect as an original

document.  At the request of any party, any faxed or electronically transmitted document will be re-executed by each signatory party in an original form.

Section 10.16. <u>Imaging of Documents</u>.   Borrower understands and agrees that (a) Lender's document retention policy may involve the electronic imaging of executed Loan Documents and the destruction of the paper originals, and (b) Borrower waives any right that it may have to claim that the imaged copies of the Loan Documents are not originals.

Section 10.17. <u>No Oral Agreements</u>.  The term "WRITTEN AGREEMENT" will include this Loan Agreement, together with each and every other document relating to and/or securing the Obligations, regardless of the date of execution. **THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.   THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

Section 10.18. <u>**WAIVER OF RIGHT TO TRIAL BY JURY**</u>**.   EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT NOT PROHIBITED BY APPLICABLE GOVERNMENTAL REQUIREMENT, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS LOAN AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).   EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS LOAN AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

Section 10.19. <u>Amendment and Restatement</u>.   This Loan Agreement is given in amendment and restatement and not in extinguishment or novation of the obligations of Borrower under the Pre-Petition Loan Agreement and the Pre-Petition Loan Documents, including, but not limited to, the Security Agreement; the Subordinate Deed of Trust, Security Agreement, Assignment of Leases, Assignment of Rents, and Financing Statement; the Trademark Collateral Security Agreement; the Security Interest Assignment (Patents & Trademarks; and the Security Interest Assignment (Copyrights), each dated August 17, 2011 by and between Borrower and Lender, as the same has been amended, restated or modified from time to time.   Each of the foregoing security instruments is hereby ratified and adopted as security instruments securing the Collateral for this Loan Agreement.

[Remainder of Page Intentionally Left Blank]

Executed as of the date first written above.

**<u>BORROWER</u>**:

_____

By: _____
Name: _____
Title: _____

**<u>LENDER</u>**:

FROST BANK,
a Texas state bank

By: _____
Name: _____
Title: _____

**Schedule 1**

**<u>Real Estate</u>**



**Schedule 5.09(c)**

**<u>Assumed Names or Trade Names</u>**

**EXHIBIT A**

**BUDGET**

4840-0227-7139, v.  3